# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **DAVID B. HESTON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case number 4:05cv2409 TCM** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,[1]** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying the application of David B. Heston for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, is before the Court[2] for a final disposition. Mr. Heston ("Plaintiff") has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Alleging a disability since November 15, 2003, caused by degenerative disc disease, chronic pain, and ruptured and herniated discs, Plaintiff applied in May 2004 for DIB. (R.

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

at 99-102.[3]) His application was denied initially and after a hearing held in July 2005 before Administrative Law Judge ("ALJ") James B. Griffith. (Id. at 11-16, 47-51, 211-37.) The Appeals Council then denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 2-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Michael Brethauer, a vocational expert ("VE"), testified at the administrative hearing.

Plaintiff testified that he was born on September 2, 1954, and was then 50 years' old. (Id. at 214-15.) He was 5 feet 10 inches tall and weighed approximately 210 pounds. (Id. at 215.) Due to his now-sedentary lifestyle, he had gained 30 pounds after his accident. (Id.) He had finished high school. (Id.) He was married, and lived with his wife and one child under the age of 18 years. (Id.)

Other than an early try at selling cemetery lots, Plaintiff had been a sheet metal worker all his work-life. (Id. at 215-16, 218.) He had a work-related accident in August 2002, and stopped working in November 2003. (Id. at 219.)

Plaintiff had had 12 physical therapy sessions to try to improve his flexibility and had had some steroid injections. (Id. at 220.) Neither had significantly improved his condition. (Id.)

---

[3]References to "R." are to the administrative record filed by the Commissioner with his answer.

At the current time, Plaintiff could stand for only ten minutes before having to lean up against the wall and find a place to sit down. (<u>Id.</u> at 221.) He would have pain his back, above the belt line, and weakness in his legs. (<u>Id.</u>) He could not walk farther than a quarter mile and could only do ten minutes on the treadmill once a month. (<u>Id.</u> at 221-22, 233.) Afterwards, he would have to crawl up the stairs because his back would hurt too much to walk up. (<u>Id.</u> at 222.) If he could change positions, he could sit for 15 or 20 minutes. (<u>Id.</u>)

He has never been without pain. (<u>Id.</u>) The pain is a shooting pain and "[p]retty severe." (<u>Id.</u> at 222-23.) He no longer golfed, worked, mowed the yard, or picked up around the house. (<u>Id.</u> at 223, 226.) He loved to hunt, but no longer could. (<u>Id.</u> at 226.) If he tried to cook, he had to sit down after a few minutes because of his back pain. (<u>Id.</u> at 227.) He needed to use a chair in the shower, and took only two showers a week. (<u>Id.</u>) If a gallon of milk was at waist level, he could pick it up. (<u>Id.</u> at 223.) He could not pick it up from the floor unless he had something to lean against. (<u>Id.</u>) If he bent down from the waist, he would get a shooting pain up his legs and to the back. (<u>Id.</u>) To relieve the pain, he lies down and puts ice on it. (<u>Id.</u>) He tries to put ice on his back in 20-minute intervals, approximately six times a day. (<u>Id.</u> at 224.) He has been doing this for the past two and one-half to three years. (<u>Id.</u>)

Plaintiff does not think he is getting better. (<u>Id.</u>) His Vicodin prescription was just increased to 750 milligrams. (<u>Id.</u> at 224-25.) He is going to start with two pills a day. (<u>Id.</u> at 225.) They make it hard for him to sleep. (<u>Id.</u>)

Asked to describe his activities on a typical day, Plaintiff replied that he got up in the morning, made coffee, read a book, walked outside, did some crossword puzzles, walked back inside, lay down, and watched television.  (Id.)  He probably spent three hours sitting outside during the day.  (Id. at 232.)  He tried to do a household repair – recaulking his bathtub – but had to stop because of the pain.  (Id. at 225.)  The last time he drove, two weeks before, he ran two red lights.  (Id. at 225, 226.)  Asked to describe his sleep, Plaintiff replied, "bad."  (Id. at 227.)  His medication makes it hard for him to get to sleep; his pain makes it hard for him to stay asleep.  (Id.)  The pain in his back that was always present was a four on a scale of one to ten, with ten requiring emergency medical attention.  (Id. at 231.)  The pain in his back that happened occasionally, and that he tried to avoid by not doing what brought it on, was a seven.  (Id.)  His medication did not alleviate the pain, it just made him not care about the pain.  (Id.)  He did not take the medication as often as prescribed because it did not do any good.  (Id. at 232.)

Asked by the ALJ about unemployment benefits, Plaintiff stated that he received such benefits until May 2004.  (Id. at 229.)  He had tried to find sheet metal jobs, but would not get hired as soon as people found out he had a bad back.  (Id.)  He did not apply for any other types of work.  (Id.)

The day before, his doctors had given him some exercises to do.  (Id. at 233.)  In approximately two weeks, he was going to participate in a more aggressive physical therapy program with Dr. Feinberg.  (Id.)

Mr. Brethauer testified that he had reviewed the file for vocational information and had heard Plaintiff's testimony.  (Id. at 234.)  Plaintiff's past work as an assistant construction superintendent and sheet metal installer had provided him with some transferable skills to a lower exertional capacity job, i.e., laying out and inspecting tools, scheduling, ordering, and planning.  (Id. at 235.)  He was then asked if a hypothetical person who was "able to occasionally lift and carry 25 pounds, frequently lift and carry 15 pounds, who could stand and/or walk for up to six hours in a workday assuming a normal break, sit for up to six hours in workday assuming a normal break" could perform Plaintiff's past work.  (Id.)  Such a person could perform the job of an assistant construction superintendent as it was described in the Dictionary of Occupational Titles ("DOT"), but not as it was performed and described by Plaintiff.  (Id.)  A hypothetical person "able to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, who could stand and/or walk for up to six hours in a workday assuming the normal breaks, sit for up to six hours in an eight-hour workday assuming the normal breaks, only occasionally climb . . ., only occasionally stoop, and who should avoid concentrated exposure to vibration" would also be able to perform the job of an assistant construction superintendent as described in the DOT.  (Id.)  If, however, one accepted Plaintiff's descriptions of his abilities to walk, stand, and sit, a person of those abilities could not perform Plaintiff's past work.  (Id. at 236.)  There were some jobs that such a person could perform; and those jobs existed in a relatively limited number, i.e, no more than 1,000 in Missouri and 50,000 in the national economy.  (Id.)  If a person also

needed to lay down and apply ice five to six times a day, for 20 minutes each time, there was no job that could accommodate such a need.  (Id. at 237.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to that application, and medical records.

Plaintiff indicated on a "Disability Report Adult" that he was 5 feet 10 inches tall and weighed 225 pounds.  (Id. at 146.)  His impairments first bothered him on November 15, 2003.  (Id. at 147.)  It was on that date that he also became unable to work and stopped working.  (Id.)  He had been treated for pain by Dr. Heidi Prather beginning in 1999 and last in November 2003 and for his back by Charles Hertel in April 2003.[4]  (Id. at 149.)  He had consulted Dr. Brett Taylor in January 2004 about his back; he had recommended surgery.  (Id. at 150.)

In July 2005, Plaintiff updated his records, listing four different doctors who had recently treated or examined him and noting that two had recommended fusion surgery and told him he would not be able to return to his previous work even with such surgery.  (Id.)

On a "Work History Report," he listed two construction jobs, one as a mechanic from 1974 to 1992 and one as a foreman from 1992 to November 2003.  (Id. at 138.)  He explained in his hearing testimony that both were sheet metal jobs.  (Id. at 216-17.)  On an

_____

[4]Dr. Hertel's records are dated April 200*4*.

updated form, he listed fourteen different employers and the same job – sheet metal – for each. (<u>Id.</u> at 109.)

On a questionnaire completed by his non-attorney representative, Plaintiff described the symptoms that kept him from working:

> I experience chronic and severe pain. I cannot stand or sit for any length of time. I must constantly change my position while sitting due to pain. I can only drive short distances due to pain and fatigue. I have numbness and weakness in my legs. I avoid climbing stairs if I can. I cannot lift or carry anything heavy. I cannot bend at the waist because this causes severe pain. I tire easily. I have trouble getting to sleep and staying asleep. I do not sleep more than 3-4 hours at a time. I rarely feel rested in the morning.

(<u>Id.</u> at 123.) Hydrocodone, prescribed by Dr. Prather to be taken as needed, made it difficult for him to sleep. (<u>Id.</u>) He did not use any assistive device, e.g., a cane or walker. (<u>Id.</u> at 124.) He was able to do a few activities. (<u>Id.</u> at 125.) For instance, he could load the dishwasher because he did not have to bend; he could vacuum because he used an upright vacuum for support and balance; he could mow the lawn if he took pain medication and breaks. (<u>Id.</u>) He could not take out the trash. (<u>Id.</u>) He prepared sandwiches and fruit; his wife prepared the evening meals. (<u>Id.</u> at 125A.) He showered every three days and shaved every week. (<u>Id.</u>) He used a handrail in the shower. (<u>Id.</u>) He wore loose-fitting clothes that were easy to pull on. (<u>Id.</u>) He rarely left his house, other than to sit on the patio. (<u>Id.</u> at 127.)

October 2000 is the date listed on an unsigned pain questionnaire as the date when his pain first limited his activities. (<u>Id.</u> at 128.)

An earnings report generated for Plaintiff listed consistent annual income.  (Id. at 65.)  In 2003, that income was $56,664.77.  (Id.)  In 2004, it was $5,472.00.  (Id.)

The chronology and substance of Plaintiff's medical treatment is as follows.

The earliest medical record from Heidi Prather, D.O., is dated January 3, 2003, and refers to Plaintiff as an established patient.  (Id. at 197-98.)  Dr. Prather noted that she had treated Plaintiff in the past for a herniated disc at L5-S1.  (Id. at 197.)  She had not heard from him in "many months" until he called the week before because of an exacerbation of pain.  (Id.)  He was unable to sit, stand, or walk.  (Id.)  She noted that he had responded well to L5-S1 injections on the left in the past, but now had right-sided symptoms.  (Id.)  On examination, he was in no acute distress and was able to go through lumbar flexion and extension and side bending and rotation.  (Id.)  His current medications included a Medrol Dosepack prescribed for him the week before over the telephone and Flexeril.  (Id.)  Dr. Prather's impression was of bilateral radicular pain at L5-S1.  (Id.)  Because Plaintiff had not a recent magnetic resonance imaging ("MRI") scan for two and one-half years, Dr. Prather recommended that one be performed.  (Id.)  He was going to have a bilateral L5-S1 transforaminal epidural steroid injection.  (Id.)

Five days later, Plaintiff underwent an MRI of his lumbar spine.  (Id. at 196.)  The discs at L1-2 and L2-3 appeared normal.  (Id.)  There was a small annular tear at L3-4 with minimal bulge, unchanged from the prior MRI; a tiny annular tear at L4-5 with protrusion of the disc, a slight increase from the prior MRI; and degenerative disc disease at L5-S1 with a small herniation approaching the left S1 nerve root, unchanged from the prior MRI.  (Id.)

Dr. Prather next treated Plaintiff on November 4. (Id. at 195-95A.) Plaintiff reported that the injections had helped "some," but no longer did. (Id. at 195.) He was taking Ultram for pain. (Id.) On examination, he had pain with forward flexion. (Id.) Dr. Prather gave him samples of Bextra, to be taken for "break through" pain. (Id. at 195A.) A repeat MRI and electromyogram ("EMG") were recommended. (Id. at 195.) He was also to be referred to Dr. Brett Taylor. (Id.)

The repeat MRI revealed the same problems had the earlier one, with the exception of an interval increase in the small herniation at L5-S1. (Id. at 194A.)

In April 2004, Plaintiff was examined by Ronald C. Hertel, M.D. with the St. Louis-Clayton Orthopedic Group, Inc. (Id. at 202-08.) After describing the 2002 accident and his prior medical treatment, Plaintiff reported that his lower limbs would become numb if he stood for longer than ten minutes. (Id. at 202-03.) The numbness did not extend below his knees, nor did he have any weakness below the knees. (Id. at 203.) He was unable to bend or stoop. (Id.)

On examination, he was in no apparent distress and walked with a physiological gait, but "somewhat slow." (Id.) He had some difficulty walking on the heel of his left foot. (Id.) Straight leg raising caused pain in his left buttock. (Id.) He also experienced pain at approximately 60 to 70 degrees of hip flexion in the supine position. (Id.) He had a slightly restricted flexion in both hips. (Id.) His left thigh was one centimeter smaller in circumference than his right; his left calf was one and one-half centimeter smaller than his right. (Id. at 203-04.)

Dr. Hertel reviewed medical records sent from Plaintiff's attorney, including the records of Drs. Elcock, Robson, Sheer, Taylor, and Prather. (Id. at 204-05.) The latter records dated back to May 2000. (Id. at 205.) In January 2004, Dr. Taylor had "recognized [Plaintiff's] dependency on narcotics." (Id. at 206.) Dr. Hertel recommended a lumbar myelogram. (Id.) There is no record of one being performed.

Mark Litchenfeld, M.D., completed an "Accident & Sickness Benefit Claim Form" on behalf of Plaintiff in May 2004. (Id. at 199.) He did not list a diagnosis. (Id.) He used November 15, 2003, as the date from which Plaintiff was continuously disabled. (Id.) The form, apparently created by Plaintiff's labor union, notes that "there is no light duty in the sheet metal trade." (Id.) Dr. Litchenfeld had first seen Plaintiff on the day he completed the form. (Id.) He was to see him again in July. (Id.)

X-rays performed in June 2004 revealed degenerative disc disease also at the T11-12 level.[5] (Id. at 194.)

Plaintiff was examined in June 2004 by Matthew F. Gornet, M.D., with the Orthopedic Center of St. Louis. (Id. at 184-87.) Plaintiff reported that he had had intermittent low back pain following a September 1998 accident and had been receiving periodic injections every six months for that pain. (Id. at 184.) The last injection had been three months before the August 2002 injury. (Id.) He currently had constant pain that was worse with prolonged sitting, bending, and standing. (Id.) He had bilateral leg pain and

---

[5]The x-ray report does not list the referring physician. It is from the same medical facility as the MRIs.

numbness and weakness in both legs.  (Id.)  He had no bowel or bladder symptoms.  (Id.)
He took two Vicodin a day.  (Id.)  His leg lengths were equal.  (Id. at 185.)  There was no
atrophy in his calves.  (Id.)  Straight leg raising was positive at 60 degrees for low back and
buttock pain.  (Id.)  His gait was normal.  (Id.)  After reviewing previous MRIs, Dr. Gornet
concluded that Plaintiff had discogenic low back pain in the L5-S1 segment and
recommended that Plaintiff have a new MRI scan.  (Id.)

After that scan was performed, Plaintiff returned to Dr. Gornet in August.  (Id. at
183.)  Dr. Gornet noted that the scan had revealed central disc herniation at L5-S1 and a
central disc protrusion at L4-5.  (Id.)  Plaintiff had also had some changes in disc hydration,
a loss of disc height, and changes at L3-4.  (Id.)  If his L3-4 disc was not symptomatic,
Plaintiff would be a candidate for a two-level disc fusion.  (Id.)  Dr. Gornet recommended
a discogram to determine whether the L3-4 disc was symptomatic.  (Id.)

The discogram revealed findings indicating that the L3-4 disc was symptomatic.  (Id.)
Consequently, at Plaintiff's visit the next month, Dr. Gornet informed him that he would
probably require a three-level fusion.  (Id.)  If a disc replacement were available, a hybrid
treatment could be explored.  (Id.)  Neither would permit Plaintiff to return to a laboring
position.  (Id.)  Plaintiff was to contact Dr. Gornet if he wished to proceed; there is no
indication he did so.  (Id.)

Plaintiff was examined by Barry I. Feinberg, M.D., in January and May 2005.  (Id.
at 71-79, 159-66.)  Plaintiff reported at the January evaluation that he had a history of low
back pain as a result of a work-related accident that occurred on September 19, 1998.  (Id.

at 72.)  He had another injury on August 15, 2002.  (Id.)  He had a diagnosis of degenerative disc disease, and had had approximately two lumbar epidural steroid injections from Dr. Prather each year.  (Id.)  He called Dr. Prather for a refill on his pain medication after the 2002 injury, and saw her in January and February 2003.  (Id.)  By November 2003, he was no longer able to handle the pain and was laid off.  (Id.)  Dr. Brett Taylor had recommended a lumbar fusion, as had Drs. Gornet and Rutz.  (Id. at 72, 73)  Plaintiff's current complaints included tightness in his hamstrings and an inability to walk for any length of time.  (Id. at 72-73.)  Pain caused him to wake up every one to two hours each night, and he had to constantly change positions.  (Id. at 73.)  Pain in his right leg radiated down to the knee and in his left leg down to the foot.  (Id.)  He had to climb stairs one leg at a time because of the pain.  (Id.)  He also had severe pain in his lower back.  (Id.)  His pain was worse with walking, sitting, or bending.  (Id.)  The pain was at least a three on a ten-point scale, was usually a four or five, and was at worst an eight.  (Id.)  He had sexual dysfunction and urgency in bowel functions.  (Id.)  Plaintiff further reported to Dr. Feinberg that his medications included Vicodin and Flexeril.  (Id.)  He took four to six Vicodin pills each day, and four Flexeril.  (Id.)

Dr. Feinberg had before him the medical records of Drs. Rutz, Gornet, Prather, Elcock, Robson, and Taylor and of Plaintiff's physical therapy.  He summarized those records, including the following.  Dr. Rutz noted in his December 2004 report that Plaintiff "may have a degree of symptom magnification."  (Id. at 74.)  This conclusion was based on Dr. Rutz's opinion that Plaintiff would be interested in surgical intervention if his symptoms

were as severe and of such duration as Plaintiff attested to, but Plaintiff was not interested in surgery. (Id.) The only permanent restriction placed by Dr. Rutz on Plaintiff was not to lift anything heavier than 50 pounds. (Id.) Dr. Rutz's August 2004 records referenced a MRI in July that had revealed a left L5-S1 disc herniation with degenerative disc disease at L3 to S1 and mild degenerative disc disease at L4-5 with mild central disc herniation. (Id. at 75.) Dr. Rutz opined in those records that the August 2002 injury was not a substantial factor in Plaintiff's pain development. (Id. at 75.) Dr. Gornet came to the opposite conclusion and diagnosed Plaintiff in June 2004 with discogenic, low back pain. (Id.) Dr. Prather treated Plaintiff for an L5-S1 disc herniation with epidural injections, root blocks, and medication. (Id.) The first time Plaintiff received injections for right-sided pain was in January 2003. (Id.)

On examination, Plaintiff had numbness in his legs and pain in his joints. (Id. at 74.) He was ambulatory with marked left antalgia. (Id. at 76.) He was forward flexed at the waist to approximately 15 degrees. (Id.) He had difficulty fully weight bearing on his right lower extremity and standing from the sitting position. (Id.) He had overactivity of his left lumbar muscles and increased activity in his thoracic paravertebral muscles, primarily on the right side. (Id.) He had compensatory changes in his cervical spine and apparently had an anatomical left length discrepancy, short on the left side. (Id. at 77.) Negative straight leg raising was bilateral. (Id.) He had pain with internal rotation of his left hip and with restricted external rotation of his right hip. (Id.) He also had a decreased ability to sense temperature changes in his entire left lower extremity below the knee. (Id.)

Dr. Feinberg's impression was of lumbar radiculopathy, degenerative disc disease of the lumbar spine, musculoskeletal pain syndrome in the lumbar spine with compensatory changes in the thoracic and cervical region, and sacroiliitis. (Id.) His opinion was that Plaintiff needed a combination of a comprehensive physical therapy program to correct compensatory changes in his cervical, thoracic, and lumbar spine, injection therapy, including epidural injections, and medication. (Id. at 78-79.) He also needed correction of his leg length discrepancy, either by shoe lift or by another orthotic device. (Id. at 78.) Additionally, Dr. Feinberg concluded that the August 2002 incident was a substantial factor in Plaintiff's current complaints of pain and need for treatment. (Id. at 79.) Plaintiff had not obtained maximum medical improvement. (Id.)

On May 2, Plaintiff participated in a functional capacity evaluation to determine whether he could return to his past job. (Id. at 167-80.) Of the thirteen criteria employed to determine whether Plaintiff was magnifying his symptoms, he failed seven. (Id. at 168.) One of those failed criteria was whether his movement patterns and range of motion changed in relation to his report of increased pain. (Id.) They did not. (Id.) On one of the six criteria he did pass, he only barely did so. (Id.) Plaintiff reported to the evaluator that he did home exercises three times a day; mowed the grass, with breaks; cooked; and took out the trash. (Id. at 169.) He had a "zero" chance of returning to work as a sheet metal foreman, and did not express any alternate work plans. (Id.) On a lumbar range of motion pre-test, he had a lumbar flexion and lumbar extension that were each 29% of normal; a left lateral flexion that was 56% of normal; and a right lateral flexion that was 53% of normal. (Id. at

171.)  The coefficient of variance in the lumbar extension could be an indicator of inconsistent effort.  (Id.)  After attempting various lifts, his lumbar extension was 3% of normal.  (Id. at 172.)  The coefficient of variance in the lumbar extension again possibly reflected inconsistent effort.  (Id.)  His heart rate during the test was inconsistent with the rating of perceived exertion and could indicate sub-maximal effort.  (Id.)  On a functional activity circuit, Plaintiff walked with a mild antalgic gait.  (Id. at 173.)  When climbing stairs or ladders, he displayed an inconsistent step to step pattern, primarily bearing weight on his left lower extremity but occasionally bearing weight on his right lower extremity without difficulty.  (Id.)  His hand grip was strength was in the below normal range.  (Id. at 174.)  Certain indicators in that test were that his effort could have been sub-maximal.  (Id.)  On the treadmill test – terminated by Plaintiff after 5 ½ minutes due to low back pain – there was again an inconsistency between Plaintiff's perceived exertion and his heart rate.  (Id. at 178.)  Low back pain limited his bending by 75%.  (Id. at 179.)

Dr. Feinberg evaluated Plaintiff again on May 24.  (Id. at 159-66.)  Plaintiff reported that two selective nerve root blocks had helped the burning in his legs but not the lateral thigh numbness or his low back pain.  (Id. at 161.)  Physical therapy had helped his mobility and back pain, but not the burning pain.  (Id. at 162.)  Dr. Rutz had again recommended surgery; Plaintiff refused.  (Id.)  He was taking Vicodin four times a day and was currently under the care of Dr. Mark Litchenfeld.  (Id.)  His recent medical records were summarized.  (Id. at 163-64.)

After examining Plaintiff, Dr. Feinberg concluded that no significant changes had been made from the opinions he earlier expressed. (Id. at 164-65.) He also noted that Plaintiff explained his effort on the earlier functional capacity evaluation by admitting that he had refused to perform any tasks he knew would increase his pain. (Id. at 165.) Dr. Feinberg repeated his treatment recommendations. (Id.) He also opined that, based on the functional capacity evaluation, Plaintiff could return to full duty in a sedentary job. (Id. at 166.)

The records before the ALJ also included the report of a consultative orthopedic examination of Plaintiff performed in August 2004 by Jack C. Tippet, M.D. (Id. at 188-92.) Plaintiff's chief complaints were low back pain, pain in both legs, and occasional pain and numbness in his left lower leg. (Id. at 188.) Plaintiff reported that he was scheduled for a discogram in September and was prepared to have surgery if necessary. (Id.) He walked without a limp and did not require any assistance when walking. (Id. at 189.) He could stand on his heels and toes and could, with some difficulty, squat and then return to a standing position. (Id.) He could bend forward only to the degree that he could touch his hands to his knees. (Id.) He could get on and off the examining table without difficulty. (Id.) On examination, he had mild tenderness in the lumbar region at midline. (Id.) He had a normal range of motion in his hips and his knees. (Id. at 189, 191.) He had a limited range of motion in his right and left ankle. (Id. at 189, 192.) His left calf was one quarter inch smaller in circumference than his right. (Id. at 189.) He had a normal range of motion in his feet with good stability and no tenderness or swelling. (Id.) He also had a normal range of

motion in his shoulders, elbows, wrists, and neck.  (Id. at 191-92.)  His lateral extension of his cervical and lumbar spine was limited, as was his lumbar spine flexion and extension. (Id. at 192.)  His grip and upper extremity strength were normal.  (Id. at 191.)  Dr. Tippett diagnosed Plaintiff as having chronic low back pain with degenerative disc disease.  (Id. at 190.)

Two weeks later, a counselor with the State of Missouri's Section of Disability Determinations completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff.  (Id. at 130-37.)  Degenerative disc disease was listed as the primary diagnosis; mild disc space narrowing at L3-4 was the secondary diagnoses; and a small herniation at L5-S1 was an additional alleged impairment.  (Id. at 130.)  Plaintiff's exertional limitations were described as being able to occasionally lift 20 pounds, to frequently lift 10 pounds, to stand or walk for approximately 6 hours during an 8-hour workday, and to sit with periodically alternating between sitting and standing for approximately 6 hours during an 8-hour workday.  (Id. at 131.)  These limitations were based on the medical records to date and on Plaintiff's activities of daily living report.  (Id. at 132.)  He also needed to avoid having to frequently climb, stoop, knee, crouch or crawl and having to more than occasionally balance.  (Id.)  He had no manipulative, visual, or communicative limitations.  (Id. at 133-34.)  His only environmental limitation was a need to avoid concentrated exposure to vibrations.  (Id. at 134.)

## The ALJ's Decision

The ALJ first noted that Plaintiff had not engaged in substantial gainful activity since November 2003 and that his income in 2004 was vacation pay. (Id. at 12.) The ALJ next found that Plaintiff's discogenic and degenerative disorders of the back were severe impairments. (Id.) These impairments did not, however, meet or medically equal an impairment of listing-level severity. (Id.)

Concluding that neither the medical image results nor the physical examination results supported a finding of disability, the ALJ detailed the various findings in the different reports, e.g, Dr. Hertel's report showing Plaintiff had a physiological gait, Dr. Gornet's report showing he had a normal gait, and Dr. Tippet's report showing he had a non-antalgic gait. (Id. at 12-13.) The ALJ also noted the findings of the May 2005 functional capacity evaluation that Plaintiff could perform work at the light exertional level, if not higher. (Id.) This finding was echoed by the those of Drs. Hertel and Feinberg. (Id.)

Assessing Plaintiff's credibility, the ALJ found it lacking, specifically citing (a) inconsistencies in Plaintiff's testimony describing his inabilities and his activities, (b) the lack of any objective medical evidence showing any significant deterioration of his lumbar condition after September 1998, five years before his alleged disability onset date, (c) inconsistencies between Plaintiff's descriptions of constant and severe pain and his failure to aggressively pursue medical attention, (d) inconsistencies between Plaintiff's report of adverse side effects of medication and the lack of any complaint about such side effects to a physician, and (e) inconsistencies between Plaintiff's receipt of unemployment benefits and his claim he could not work during that time. (Id. at 13-14.)

Based on the foregoing, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to lift or carry 20 pounds occasionally and 10 pounds frequently, to sit, stand or walk for six hours during an eight-hour work day, and to occasionally stoop and climb stairs. (Id. at 14.) He needed to avoid concentrated exposure to vibration. (Id.) With this RFC, Plaintiff could perform his past relevant work as an assistant construction superintendent as it is performed in the national economy. (Id. at 14, 15.) He was not, therefore, disabled within the meaning of the Act. (Id. at 15.)

### Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second,

the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598,

604 (8th Cir. 1997) (quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).  Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence.  **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added).  Some medical evidence must be included in the record to support an ALJ's RFC holding.  **Id.** at 867.  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions."  **Ramirez**, 292 F.3d at 581 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."  **Id.**  <u>See also</u> **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical

evidence regarding a claimant's disability is inconsistent."). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. See **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

"Where the claimant has the [RFC] to do either the specific work previously done or the same type of work as it is generally performed in the national economy, [as the VE testified in the instant case], the claimant is found not to be disabled." **Lowe**, 226 F.3d at 973 (alterations added).

The burden at step four remains with the claimant. See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account

whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ improperly (1) assessed his residual functional capacity, in part, by failing to (a) develop the record and (b) meaningfully discuss and weigh all the medical opinions; (2) assessed his credibility; and (3) phrased the hypothetical question to the VE. The Commissioner disagrees.

RFC. The duty to fully and fairly develop the record exists, "even when, as in this case, the claimant is represented by counsel." **Nevland v. Apfel**, 204 F.3d 853, 857 (8th Cir. 2000). Accord **Snead v. Barnhart**, 360 F.3d 834, 838 (8th Cir. 2004); **Weber v. Barnhart**, 348 F.3d 723, 725 (8th Cir. 2003). This duty arises "[b]ecause the social security disability hearing is non-adversarial . . . [and] the ALJ's duty to develop the record exists independent of the claimant's burden in the case." **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004) (alterations added). Also, this duty requires that the ALJ neutrally develop the facts, **id.**, recontacting medical sources and ordering consultative examinations if "the available

evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004).  If, however, a crucial issue is not undeveloped, the ALJ is not required to seek additional evidence.  See **Goff v. Barnhart**, 421 F.3d 785, 791 (8th Cir. 2005).  Moreover, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." **Black v. Apfel**, 143 F.3d 383, 386 (8th Cir. 1998) (alteration added).  "An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." **Id.**

In the challenged decision, the ALJ noted that he had reviewed the medical records of Drs. Feinberg, Gornet, Hertel, Prather, and Tippet.  It is clear from the record that Drs. Feinberg, Gornet, and Hertel examined Plaintiff at the request of an attorney to, at least in large part, determine whether the August 2002 work-related accident was a substantial factor in his current condition and to assess what that condition was.  The ALJ's discussion of the three doctors' records concentrates on their findings, and those of Drs. Prather and Tippett.  The ALJ's conclusion that Plaintiff had severe impairments are based on those records.  There is simply no objective, substantial basis in the records to support a conclusion based on the medical records alone that Plaintiff is disabled.  It is not that the ALJ failed to develop the record; it is that the developed record failed to support a finding of disability.  This is a distinction with a difference.

Plaintiff also takes issue with the ALJ's failure to discuss the findings of Dr. Litchenfeld.  Dr. Litchenfeld completed a form asking for the beginning and ending date of

the period during which Plaintiff was unable to do sheet metal work. He did not list a diagnosis, nor is there any indication he saw Plaintiff. The ALJ did not err by not specifically citing Dr. Litchenfeld's conclusory, irrelevant opinion. See **Holmstrom v. Massanari**, 270 F.3d 715, 720-21 (8th Cir. 2001) (ALJ did not err in discounting doctor's opinion about claimant's RFC; opinion was noted on checklist form, based only on relatively short-term relationship, and was inconsistent with medical evidence as a whole).

Plaintiff's Credibility. As noted above, when evaluating a claimant's RFC, the ALJ must consider, inter alia, the claimant's own descriptions of his limitations. **Pearsall**, 274 F.3d at 1217. Consequently, the ALJ must evaluate the claimant's credibility. **Id.** at 1218. See also **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006) (noting that ALJ had to assess claimant's credibility before determining his RFC). "'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting Lowe, 226 F.3d at 972).

In the instant case, after summarizing the medical evidence, the ALJ considered Plaintiff's subjective complaints and discounted them based on several Polaski factors, including the lack of supporting objective evidence and the lack of an opinion by a physician that he was disabled. These are proper considerations. See **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005) (affirming adverse credibility determination by ALJ who emphasized absence of any doctor's opinion that claimant was disabled); **Forte v. Barnhart**, 377 F.3d 892, 896 (8th Cir. 2004) (lack of objective evidence, while not conclusive, is a proper consideration); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (affirming

adverse credibility finding based in part on lack of any opinion by claimant's treating physicians that claimant was disabled); **Barrett v. Shalala**, 38 F.3d 1019, 1022 (8th Cir. 1994) (holding that the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).

The ALJ also properly considered the existence of Plaintiff's impairments prior to the alleged onset date as detracting from his credibility.  See **Goff**, 421 F.3d at 793 (finding that impairment was not as severe as alleged by claimant because claimant had effectively worked with that impairment and there was no evidence that impairment had deteriorated since).  Dr. Prather referred to an MRI done two and one-half years before Plaintiff saw her in January 2003, approximately in the summer of 2000.  The January 2003 MRI revealed little or no change in his back since the earlier MRI.  The two MRIs are the only longitudinal picture of Plaintiff's medical treatment for his allegedly disabling condition

The contradiction between Plaintiff's description of his limitation and his lack of aggressive medical treatment was also properly considered by the ALJ as detracting from his credibility.  Plaintiff described the existence of pain that made it difficult for him to enjoy any activity, yet the only evidence of medical treatment he sought to alleviate that pain are the two records of Dr. Prather.  See **Gray v. Apfel**, 192 F.3d 799, 804 (8th Cir. 1999) (proper consideration when assessing credibility is claimant's willingness to submit to treatment and the type of medication prescribed); **Kelley v. Callahan**, 133 F.3d 583, 589 (8th Cir. 1998) (affirming adverse credibility determination in case in which claimant sought

minimal medical treatment and only occasionally used pain medication). As noted above, Plaintiff consulted the other doctors for an opinion on whether the August 2002 accident was a substantial factor in his current condition. Although some doctors recommended a course of treatment, e.g., Dr. Feinberg recommended physical therapy, medication, and injections, Plaintiff did not seek such treatment. And, although the records include references to Plaintiff taking Vicodin, Flexeril, and Hydrocodone, the only record of any medication being prescribed for him during the relevant time period were the prescriptions by Dr. Prather for Ultram and Bextra. She last saw Plaintiff in November 2003, 20 months before the hearing.

Another proper consideration by the ALJ when assessing Plaintiff's credibility was his receipt of unemployment benefits. "A claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold himself out as available, willing and able to work." **Jernigan v. Sullivan**, 948 F.2d 1070, 1074 (8th Cir. 1991) (noting that claimant's application for unemployment benefits adversely affected his credibility). Accord **Johnson v. Chater**, 108 F.3d 178, 180-81 (8th Cir. 1997) (holding that Commissioner's decision to deny claimant disability benefits was "bolstered by the fact that [claimant] received unemployment compensation during the time she claims to have been disabled").

Plaintiff takes issue with the ALJ's description of his daily activities, correctly noting that a claimant need not be reduced to a totally sedentary lifestyle to be disabled within the meaning of the Act. Plaintiff misapprehends, however, the context of the ALJ's description. The ALJ considered the inconsistencies between Plaintiff's description of his activities, e.g.,

he could not take out the trash or vacuum, and other indications in the record, his report in May 2005 that he did take out the trash and an earlier report that he did vacuum. Such inconsistencies are a proper consideration when evaluating a claimant's credibility. <u>See</u> **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005) (deferring to ALJ's credibility determination in case in which claimant gave inconsistent information to physicians and other health care providers); **Holmstrom**, 270 F.3d at 721-22 (affirming adverse credibility determination based on inconsistencies between what claimant told doctor and hearing testimony). <u>See</u> <u>also</u> **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2005) (affirming ALJ's finding that claimant was not fully credible; claimant's "self-reported limitations" were inconsistent with hearing testimony and medical record). Moreover, even if the ALJ erred in his assessment of Plaintiff's daily activities, that "was only one of the several inconsistencies he identified" and his overall decision was otherwise properly supported.[6] <u>See</u> **Cox v. Barnhart**, 471 F.3d 902, 908 (8th Cir. 2006).

Another proper consideration was the lack of any complaint to a physician about a medication's unwelcome side effect. <u>See</u> **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004) (affirming adverse credibility determination based in part on inconsistency between claimant's assertion that she had problems concentrating because of pain medication but she never complained to her doctors of the side effect).

_____

[6]The Court notes that there are also inconsistencies in the record about the date when Plaintiff's allegedly disabling impairments first bothered him. When applying for DIB, he reported that they first bothered him in November 2003; on a pain questionnaire, he listed October 2000 as the relevant date; to a physician, he stated that September 1998 was the date.

At issue in the present case is not whether Plaintiff suffers pain, but whether that pain precludes him from substantial gainful activity. The ALJ determined that it did not; this determination is supported by the record. See **Goff**, 421 F.3d at 792 (affirming decision of ALJ who considered, inter alia, claimant's failure to use canes or crutches to help impairment and the lack of any medically determinable impairment fully explaining claimant's pain); **Randolph v. Barnhart**, 386 F.3d 835, 842 (8th Cir. 2004) (affirming adverse credibility determination in case in which claimant testified that her ability to bend and move was severely limited but medical examinations revealed only slight restrictions, an ability to get on and off the examining table without assistance, the lack of any signs of back pain, and a normal gait).

Hypothetical Question to VE. "[T]estimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997) (alteration added). "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Accord **Lacroix v. Barnhart**, 465 F.3d 881, 889 (8th Cir. 2006); **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999). Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question. **Johnson v. Apfel**, 240 F.3d 145, 1148 (8th Cir. 2001).

In the instant case, the ALJ included only those limitations that he found supported by the record, giving Plaintiff the benefit of the doubt on any specific functional limitations. The additional limitations Plaintiff contends should have been included were properly rejected by the ALJ as discussed above. See **Strongson**, 361 F.3d at 1073 (concluding that ALJ's hypothetical question properly included only the impairments the ALJ found credible); **Harris v. Barnhart**, 356 F.3d 926, 930 (8th Cir. 2004) (finding no error in ALJ's hypothetical question to VE that did not include limitations described by claimant and properly discounted by ALJ; **Pearsall**, 274 F.3d at 1220 (rejecting challenge to hypothetical question that did not include limitations found by treating physician that were properly discounted by ALJ). Plaintiff's argument to the contrary is without merit.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (alterations added) (interim citations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of March, 2007.